MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By:    F. JAMES LOPREST, JR. (FJL:3210)
Special Assistant United States Attorney
86 Chambers Street, Room 410
New York, New York 10007
Tel. No.: (212) 637-2728

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
BESHIR MOHAMMED ZAHIR,                          :

          Plaintiff,                 :    DECLARATION OF
                                            F. JAMES LOPREST, JR.

       - v. -                                       :
                                            06 Civ. 4629 (JES)

ROBERT S. MUELLER, Director,                    :
Federal Bureau of Investigation; UNKNOWN             ELECTRONICALLY FILED
U.S. FEDERAL GOVERNMENT AGENCY OR       :
AGENCIES; MICHAEL CHERTOFF, Secretary
of the Department of Homeland Security;         :
EMILIO GONZALEZ, Director, U.S.
Citizenship and Immigration Services;           :
MARY ANN GANTNER, District Director,
U.S. Citizenship and Immigration Services, N.Y.;   :

          Defendants.                :
---------------------------------------------------------------x

      F. JAMES LOPREST, JR., pursuant 28 U.S.C. § 1746, declares the following:

      1.     I am a Special Assistant United States Attorney in the Office of Michael J. Garcia, United States Attorney for the Southern District of New York, counsel for defendants Robert S. Mueller, Director of the Federal Bureau of Investigation ("FBI"); unknown United States federal Government agency or agencies; Michael Chertoff, United States Secretary of Homeland Security; Emilio Gonzalez, Director of United States Citizenship and Immigration Services ("CIS"); and

Andrea Quarantillo, District Director of the CIS's New York District[1] (collectively, "defendants" or "Government").  I am assigned to the defense of the above-captioned matter, and I submit this declaration in support of defendants' motion to dismiss the amended complaint of plaintiff Beshir Mohammed Zahir ("plaintiff" or "Zahir").

    2.    Attached to this declaration is a true copy of the declaration of Michael A. Cannon, Section Chief of the National Name Check Program Section of the FBI's Records Management Division, which was executed on June 22, 2007, at Washington, D.C.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    June 29, 2007
            New York, New York

/s/
F. JAMES LOPREST, JR. (FJL:3210)
Special Assistant United States Attorney
Southern District of New York
86 Chambers Street, 4th Floor
New York, New York 10007
Tel. No.: (212) 637-2728

TO:    JAMES J. ORLOW, ESQ.
        ORLOW & ORLOW, P.C.
        620 Chestnut Street, Suite 656
        Philadelphia, PA 19106

---

[1] Andrea Quarantillo has succeeded Mary Ann Gantner as the District Director of the CIS's New York District and therefore should be substituted as a defendant, pursuant to Fed. R. Civ. P. 25(d)(1).

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BESHIR MOHAMMAD ZAHIR,

    Plaintiff,

v.

ROBERT S. MUELLER,
    et al.,

    Defendants.

Case No:
06-cv-4629

### DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1) I am currently the Section Chief of the National Name Check Program Section at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2) In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Beshir Mohammad Zahir, the plaintiff in this civil action.

### NATIONAL NAME CHECK PROGRAM

(4) The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign

1  police and intelligence agencies, and state and local criminal justice agencies. The Central
2  Records System ("CRS") contains the FBI's administrative, personnel, and investigative files.
3  The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower
4  Administration. That executive order addresses personnel security issues and mandates National
5  Agency Checks as part of the pre-employment vetting and background investigation process for
6  prospective Government employees. The FBI performs the primary National Agency Check
7  conducted on all United States Government employees. From this modest beginning, the
8  Program has grown exponentially, with more and more customers seeking background
9  information from FBI files on individuals before bestowing a privilege, such as Government
10 employment or an appointment, a security clearance, attendance at a White House function, a
11 "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and
12 local agencies regularly request FBI name searches. In addition to serving our regular
13 Government customers, the FBI conducts numerous name searches in direct support of the FBI's
14 counterintelligence, counterterrorism, and homeland security efforts.

15 **EXPLANATION OF THE CENTRAL RECORDS SYSTEM**

16 (5)   The FBI's CRS enables the FBI to maintain all information which it has
17 acquired in the course of fulfilling mandated law enforcement responsibilities. The records
18 maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files
19 compiled for law enforcement purposes. This system consists of a numerical sequence of files
20 broken down according to subject matter. The subject matter of a file may relate to an
21 individual, organization, company, publication, activity, or foreign intelligence matter. Certain
22 records in the system are maintained at FBI Headquarters. Records which are pertinent to
23 specific FBI Field Offices are mostly maintained at those Field Offices.
24 (6)   FBI Headquarters and each Field Division can access the CRS through the
25 FBI's General Indices. The General Indices are arranged in alphabetical order and consist of
26 indices on various subjects, including the names of individuals and organizations. Only the
27 information considered pertinent, relevant, or essential for future retrieval is indexed.
28

   (7) Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

   (8) The entries in the General Indices fall into two categories:

     (a) "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

     (b) "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

   (9) In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system consists of the following three automated applications that support case management functions for all investigative and administrative cases:

     (a) Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

     (b) Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the

    (c) Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 98.7 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

  (10) The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

  (11) When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other

reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)   If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a birth date or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)   Historically, approximately 68 percent of the name checks submitted by USCIS are electronically checked and returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)   For the name check requests that are still pending after the initial electronic check, additional review is required. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an

1 existing paper record. Review of this information will determine whether the information is
2 identified with the request. If the information is not identified with the request, the request is
3 closed as a "No Record" and USCIS is so notified.
4     (15) Once a record is retrieved, the FBI reviews the file for possible derogatory
5 information. Less than one percent of USCIS's requests are identified with a file containing
6 possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory
7 information to USCIS.

### GROWTH OF THE NAME CHECK PROGRAM

9     (16) Prior to September 11, 2001, the FBI processed approximately 2.5 million
10 name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the
11 number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4
12 million name checks. As of April 30, 2007, for fiscal year 2007, the FBI has completed over 2.0
13 million name check requests.
14     (17) A significant portion of the incoming name checks submitted over the past
15 few years has been submitted by USCIS. In fiscal year 2003, 64% of the total incoming name
16 checks were submitted by USCIS; in fiscal year 2004, 46% of the total incoming name checks
17 were submitted by USCIS; in fiscal year 2005, 45% of the total incoming name checks were
18 submitted by USCIS; and in fiscal year 2006, 45% of the total incoming name checks were
19 submitted by USCIS. As of April 30, 2007, 49% of the incoming name check requests have been
20 submitted by USCIS.

### USCIS NAME CHECK REQUESTS

22     (18) In November 2002, heightened national security concerns prompted a
23 review of the former Immigration and Naturalization Service's ("INS's") procedures for
24 investigating the backgrounds of individuals seeking immigration benefits. It was determined
25 that deeper, more detailed clearance procedures were required to protect the people and the
26 interests of the United States effectively. One of the procedures identified was the FBI's name
27 check clearance. Before November 2002, only those "main" files that could be positively
28

6

1  identified with an individual were considered responsive to the immigration authorities name
2  check requests. However, because that approach ran a risk of missing a match to a possible
3  derogatory record, the FBI altered its search criteria to include "reference" files, as well. From a
4  processing standpoint, this meant the FBI was required to review many more files in response to
5  each individual background check request.
6      (19)   In December of 2002 and January of 2003, the former INS resubmitted 2.7
7  million name check requests to the FBI for background investigations of all individuals with
8  then-pending applications for immigrations benefits for which the Immigration and Nationality
9  Act required background investigations. Those 2.7 million requests were in addition to the
10 regular submissions by the former INS. Currently, the FBI has returned an initial response to all
11 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to
12 those resubmitted requests indicated that the FBI had no information relating to the specific
13 individual who was the subject of the request, approximately 16 percent – or over 440,000 –
14 resubmitted requests indicated that the FBI <u>may</u> have information relating to the subject of the
15 inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than
16 6,300 of those resubmitted requests remain pending.
17     (20)   The FBI's processing of the more than 440,000 residuals has delayed the
18 processing of regular submissions from USCIS. A dedicated team within NNCPS has been
19 assigned to handle only these re-submitted name check requests. To the extent that the team
20 members are working on only these applications, they are unavailable to process the normal
21 submissions which are completed on a first-in, first-out basis, unless otherwise directed by
22 USCIS.
23     (21)   There are numerous factors that contribute to delays in the processing of
24 name check requests. One is the volume of incoming name checks - - the total volume of
25 incoming name check requests currently outpaces the NNCPS's available resources to process the
26 incoming volume, in addition to being able to process those name checks currently pending. As
27 of April 30, 2007, the NNCPS has received over 2.1 million name check requests. The number
28

1  of incoming name check requests averages approximately 71,000 per week, and the number of
2  completed name check requests averages approximately 68,000 name checks per week.
3              (22)   The number of "hits" on a name when it is reviewed may further
4  contribute to a delay in processing a name check request. A "hit" is a possible match with a
5  name in an FBI record. The number of times the name appears in FBI records correlates to the
6  number of records which require review.
7              (23)   The processing of common names also contributes to a delay in
8  processing a name check request. The names associated with a name check request are searched
9  in a multitude of combinations, switching the order of first, last, and middle names, as well as
10 combinations with just the first and last, first and middle, and so on. Without detailed
11 information in both the file and agency submission, it is difficult to determine whether or not a
12 person with a common name is the same person mentioned in FBI records. Common names can
13 often have more than 200 hits on FBI records.
14             (24)   The accessibility of the FBI record needed for review also contributes to a
15 delay in processing a name check request. If the date of the record is later than October 1995, the
16 record text may be available electronically; if the record predates October 1995, the paper record
17 has to be located, pulled, and reviewed. A record could be at one of over 265 possible locations
18 across the country. Requests often involve coordinating the retrieval and review of files from the
19 various 56 different FBI field offices. One person's name check may involve locating and
20 reviewing numerous files, all at different physical locations. Each request must be
21 communicated internally from the NNCPS to the field, and handled according to the current
22 priorities of the particular field office. Since it is a paper based process, it is a process subject to
23 misplaced or misfiled files. The process is time consuming and labor intensive.
24             (25)   Another contributing factor which was briefly mentioned earlier in this
25 document is the expedited request. Processing an expedited case means that an employee is not
26 available to work on a normal name check request. As directed by USCIS specifically, the FBI
27
28

8

generally processes name check requests on a first-in, first-out basis unless USCIS directs that a name check be expedited.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(26) The FBI is seeking a number of improvements to its process. Over the short-term:

(27) NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

(28) NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks.

(29) The FBI is in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload.

(30) NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(31) NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(32) As a mid-term improvement, NNCPS is exploring technology updates to the Name Check process. Specifically, the FBI is procuring textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual

1 and, once verified, assists in the adjudication analysis. This type of automation should decrease
2 the time required to process a name check, thereby increasing production. Once the software is
3 procured, the FBI will build a proof of concept system for eventual integration to the FBI's core
4 databases.
5     (33) As a long-term improvement, the FBI is developing a Central Records
6 Complex that will create a central repository of records. Currently, paper files/information must
7 be retrieved from over 265 locations throughout the FBI. The Central Records Complex will
8 address this issue and will create a central repository-scanning of documents. In addition, the
9 essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the
10 actual cost of providing name check services. Once in place, the FBI will be able to scale
11 resources proportionally with workload demands – pending name checks will pay for themselves.
12 At this time fees do not cover the basic costs of providing the service. Therefore, the FBI can not
13 adequately apply resources to processing name checks without pulling critically needed
14 personnel and funding from other programs. The FBI procured services to conduct a study to
15 determine an appropriate fee structure. This study is in its final phase.
16     (34) For the reasons stated earlier, the FBI cannot provide a specific or general
17 time frame for completing any particular name check submitted by USCIS. The processing of
18 name checks, including those which are expedited, depends upon a number of factors, including
19 where in the processing queue the name check lies; the workload of the analyst processing the
20 name check; the volume of priority checks the analyst must process for, among others, military
21 call-ups, medical emergencies, "age-outs," or immigration "lottery" winners; the number of
22 "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of
23 records from various Field Offices that must be retrieved, reviewed and resolved; and, more
24 generally, the staff and resources available to conduct the checks. While the FBI is sensitive to
25 the impact of the delays in processing name check requests, the consequence of the FBI's
26 mission on homeland security requires that its name check process be primarily focused on
27
28

providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(35) It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

### PLAINTIFF'S NAME CHECK REQUEST

(36) The name check request for plaintiff Beshir Mohammad Zahir was received by the FBI from USCIS on or about March 25, 2005, and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(37) Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 22 day of June 2007.

MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

11